UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| DUWAYNE JACKSON, CDCR #J-41016 | Case No.: 17cv0882-CAB (BLM) |
|---|---|
| Plaintiff, | **ORDER:** |
| v. | **(1) GRANTING MOTION FOR SUMMARY JUDGMENT BY DEFENDANT NAVARRO, and** |
| L. ROMERO, G. VALDOVINOS, and O. NAVARRO, | |
| Defendants. | **(2) GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT BY DEFENDANTS ROMERO AND VALDOVINOS** |
| | (ECF Nos. 111, 116) |

Plaintiff Duwayne Jackson is a state prisoner currently housed at the California State Prison, Sacramento, proceeding *pro se* and *in forma pauperis* with a Second Amended Complaint ("SAC") pursuant to 42 U.S.C. § 1983. (ECF No. 37.) Plaintiff claims that while incarcerated at the R.J. Donovan Correctional Facility ("RJDCF") in San Diego, California, the Defendants were deliberately indifferent to his serious medical needs, used excessive force amounting to cruel and unusual punishment, and retaliated against him for filing inmate grievances, in violation of the First, Eighth and Fourteenth Amendments. (*Id.*

at 4-20.) He alleges that: (1) during a cell search Defendant Navarro damaged his property, threatened him, and handcuffed him in violation of a medical order requiring waist restraints; (2) one week later Defendant Navarro, in retaliation for having filed an inmate grievance about the first incident, slammed him to the floor while escorting him after handcuffing him in violation of his medical order; and (3) four months later, in retaliation for having filed an inmate grievance about Defendant Navarro's actions, he was sprayed in the face with Oleoresin Capsicum ("OC") spray by Defendant Romero without provocation, and then punched and kicked while on the ground by Defendants Romero and Valdovinos while passively complying with orders to submit to handcuffing. (*Id.*)

Currently pending is a Motion for Summary Judgment by Defendant Navarro (ECF No. 111), and a Motion for Summary Judgment by Defendants Romero and Valdovinos (ECF No. 116). Plaintiff has filed a joint Opposition to both Motions. (ECF No. 126.) Defendant Navarro has filed a Reply. (ECF No. 131.)

For the following reasons, the Court: (1) **GRANTS** Defendant Navarro's Motion for Summary Judgment on all claims, and (2) **GRANTS** in part the Motion for Summary Judgment filed by Defendants Romero and Valdovinos as to Plaintiff's medical care claims, and **DENIES** it in part as to Plaintiff's retaliation and excessive force claims.[1]

## I. Procedural Background

Plaintiff initiated this action by filing a Complaint on May 2, 2017, naming four Defendants, Paramo, Navarro, Romero and Valdovinos. (ECF No. 1.) He filed the SAC, the operative pleading in this action, on February 26, 2018, naming those same Defendants plus four new Defendants. (ECF No. 37.) On November 9, 2018, the Court dismissed Plaintiff's claims against the four new Defendants and against Defendant Paramo, leaving only Navarro, Romero and Valdovinos as Defendants. (ECF No. 84.)

---

[1] Although this matter was referred to United States Magistrate Judge Barbara L. Major pursuant to 28 U.S.C. § 636(b)(1)(B), the Court has determined that neither a Report and Recommendation nor oral argument is necessary for the disposition of this matter. *See* S.D. Cal. Civ.L.R. 72.1(d).

Defendants Romero and Valdovinos, represented by the California Attorney General, filed the instant Motion for Summary Judgment on April 5, 2019. (ECF No. 116.) Defendant Navarro, represented by private counsel, filed the instant Motion for Summary Judgment on April 5, 2019. (ECF No. 111.) Plaintiff filed a joint Opposition to both motions on May 10, 2019. (ECF No. 126.) Defendant Navarro filed a Reply to Plaintiff's Opposition on June 5, 2019. (ECF No. 131.)

## II. Plaintiff's Allegations

Plaintiff alleges in the SAC that at all relevant times he was housed in the Enhanced Outpatient Program for mentally ill prisoners at RJDCF. (ECF No. 37 at 4.) On July 26, 2016, after several complaints to correctional employees that he was receiving only one hot meal per day in violation of prison regulations requiring inmates receive at least two hot meals per day, he covered his cell window in an "attempt to get the attention of the mental health sergeant in charge of the Enhanced Outpatient Program (EOP) at RJDCF." (*Id.*) Instead, Defendant Navarro opened his cell door "without any warning" in violation of prison regulations, pointed his M-K9 OC spray device at Plaintiff and ordered him to submit to handcuffs. (*Id.*) Plaintiff alleges he "explained to Defendant Navarro that he has an ongoing medical condition requiring plaintiff to be waist restrained as opposed to handcuff[ed]," to which Defendant Navarro allegedly replied that if Plaintiff did not submit to handcuffs "he would spray my black expletive." (*Id.*)

Plaintiff was handcuffed with his hands behind his back and taken to a shower where he was searched by Defendant Navarro while another officer, soon joined by Defendant Navarro, searched his cell. (*Id.*) Defendant Navarro allegedly told Plaintiff at that time that the correctional officers at RJDCF "were 'dirty cops' and the officers make things up to get prisoners off the yard and place false charges on them for placement in administrative segregation." (*Id.* at 5.) When Plaintiff returned to his cell he found it in disarray with missing property and damage to his television. (*Id.*) He filed a California Department of Corrections and Rehabilitation ("CDCR") 602 inmate grievance about the incident on July 27, 2016, which was denied at all levels. (*Id.* at 26-34.)

3

One week later, on August 2, 2016, while returning from evening meal service where he once again received a cold meal, Plaintiff threw his meal on the floor and threw a trash can over the railing of his cell block. (*Id*. at 5.) Defendant Navarro ordered him to pick up the trash, and when he refused, Defendant Navarro activated his personal alarm, ordered Plaintiff to assume a prone position with his hands behind his back, and he complied. (*Id*.) Plaintiff alleges he informed Defendant Navarro "again" that he had a doctor's order for waist restraints, and "by placing Plaintiff into handcuffs hurt Plaintiff's fractured scaphoid non union hand" injury. (*Id*. at 5-6.) As Defendant Navarro escorted Plaintiff off the yard, Plaintiff turned his head toward Defendant Navarro and said "you ain't got nothing on me," and Defendant Navarro reacted by abruptly attempting to slam Plaintiff down on his face. (*Id*. at 6.) Plaintiff avoided being taken down by "defending and deflecting his body weight in such a way to break the take down," which caused Defendant Navarro to fall and be laughed at by other inmates. (*Id*.) Defendant Navarro got to his feet, placed Plaintiff in a choke hold, took him to the ground, and began driving his knee into Plaintiff's back. (*Id*.) Plaintiff "began to squirm and wiggle and yell get off my back you're hurting me [and] shook the Defendant off," and was escorted by another officer to a holding cell where he "began to have mental health symptoms and become suicidal." (*Id*. at 7.) He was placed in the Mental Health Alternate housing section of the Administrative Segregation Unit, and alleges he was falsely charged with assault on a peace officer by means likely to cause great bodily injury. (*Id*.) He was transferred to another facility, and when he returned to RJDCF on January 13, 2017, he was once again housed on Facility C where the incidents with Defendant Navarro occurred, despite informing prison officials he did not feel safe returning to Facility C. (*Id*. at 13, 15.)

Plaintiff alleges that on January 16, 2017, he was brutally beaten by Defendants Romero and Valdovinos in retaliation for "exercising his constitutional rights against Defendant Navarro." (*Id*. at 13.) He states that he was released from his cell on Facility C for his breakfast meal about 7:30 a.m., and when he attempted to retrieve a kosher meal he was told by correctional officer Hodges he could not have one because his name was not

on the list and he had to fill out an application. (*Id*. at 15.) Plaintiff showed officer Hodges his "religious card" and said that if that did not suffice he would get his medication and return to his housing unit. (*Id*.) Defendant Romero then told Plaintiff to get a general population food tray. (*Id*.) Plaintiff told Defendant Romero that his religious dietary laws prohibited him from eating a tray, and "began walking away without any provocation" to the other side of the yard to get his medication. (*Id*.) As he was walking away: "Defendant Valdovinos said aloud 'get the fuck out of here.'" (*Id*.) Plaintiff states that he was shocked and turned around and said "what?" (*Id*.) Defendant Romero walked toward Plaintiff shaking his OC spray and sprayed him directly in the face without any provocation. (*Id*.) Plaintiff alleges he "immediately fell to the ground and it felt like Defendant Romero and Defendant Valdovinos and officer Hodges all three began to beat me by punching, kicking and beating me while Plaintiff was on the ground defenseless." (*Id*. at 15-16.) He alleges his left pinky finger was broken when Defendant Romero pulled his hands behind his back, he was poked in the right eye with a baton resulting in a broken blood vessel, and he sprained his right ankle. (*Id*. at 16.) As Defendant Romero handcuffed him, both braces he wore on his wrists were torn off, revealing his previously injured scaphoid non-union fracture which was the basis for his medical order for waist restraints. (*Id*.)

Plaintiff was taken to a holding cell with his jean jacket pulled down over his handcuffs. (*Id*.) He alleges his repeated requests to be decontaminated from the OC spray were denied, he was denied the use of the restroom or drinking water for three hours, was refused medical treatment, including the use of his asthma inhaler, and eventually urinated on his jacket and used it to wash the OC spray from his eyes. (*Id*. at 16-18.) He alleges Defendant Valdovinos told him "that was for what happened to Defendant Navarro," and that Defendant Romero told him he was not supposed to return to Facility C due to the incident with Defendant Navarro, and that this incident should keep him off Facility C and he better not return. (*Id*. at 17-18.) He was then brought to the administrative segregation unit and allowed to shower, but alleges he was not provided medical attention for several months and has yet to have his finger injury properly assessed. (*Id*. at 18-19.)

Plaintiff alleges he suffered damage to his left pinky finger, right ankle, lower back, right eye, and pain from his left scaphoid fracture, as well as "shame, humiliation, degradation, emotional distress, mental distress and other injuries." (*Id*. at 14.) He seeks a declaratory judgment that his federal constitutional rights were violated, an injunction directing prison officials to provide medical treatment for his injuries, as well as monetary damages and a jury trial. (*Id*. at 22-23.)

## III. Discussion

Defendant Navarro moves for summary judgment on the basis that: (1) Plaintiff's allegations regarding minor or non-existent injuries from a *de minimis* use of force does not rise to the level of an Eighth Amendment violation, (2) mere threats do not rise to the level of an Eighth Amendment violation as a matter of law, (3) any claims arising from property damage are barred because Plaintiff has no protected right to possess property in prison, has an adequate post-deprivation remedy under state law, and has provided no evidence Defendant Navarro damaged his property, (4) there is no evidence Defendant Navarro's actions were in retaliation for Plaintiff filing an inmate grievance because there is no evidence he knew of any grievance, and (5) there is no evidence Defendant Navarro was involved in the January 16 incident. (ECF No. 111-1 at 16-25.)

Defendants Romero and Valdovinos move for summary judgment on the basis that: (1) they did not use excessive force in restraining Plaintiff, but used reasonable force necessary to restore prison safety and security, (2) they were not deliberately indifferent to Plaintiff's medical needs because he was immediately examined by medical personnel and refused decontamination from the OC spray, (3) there is no evidence they retaliated against him because they were unaware he filed an inmate grievance against Defendant Navarro, and because their actions were a justifiable and reasonable response to a threat to prison security, (4) Plaintiff's claims are barred by *Heck v. Humphrey*, 512 U.S. 477 (1994) and *Edwards v. Balisok*, 520 U.S. 641 (1997), because success on his claims would necessarily invalidate his prison disciplinary finding that he precipitated their encounter by punching Defendant Romero, and (5) they are entitled to qualified immunity because they did not

violate Plaintiff's rights, and even if they did it would not have been clear to a reasonable officer that their actions violated his rights.  (ECF No. 116-1 at 14-27.)

## A.  Legal Standards

Defendants are entitled to summary judgment if they show "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).  The moving party has the initial burden of showing summary judgment is proper "by showing the absence of a genuine issue as to any material fact." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

In order to avoid summary judgment, the nonmovant must present "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  The Court may not weigh evidence or make credibility determinations, and any inferences drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party.  *Id*. at 255.  The nonmovant's evidence need only be such that a "jury might return a verdict in his favor."  *Id*. at 257.

## B.  Arguments and evidence in support and opposition to summary judgment

### 1.  Defendant Navarro's Motion for Summary Judgment

Defendant Navarro presents his own declaration stating that he was working as a correctional officer at RJDCF on July 26, 2016, and searched Plaintiff's cell that day, during which he removed soda cans which inmates are not permitted to keep in their cells. (ECF No. 111-5 at 2.)  Plaintiff became belligerent as Defendant Navarro issued him a cell search receipt, so he ordered Plaintiff to lock up in his cell.  (*Id*.)  Plaintiff ignored the order and began uttering profanities toward Defendant Navarro, refused a second order to lock

up and continued to utter profanities, and only upon a third order did he return to his cell. (*Id.*) Defendant Navarro states that he did not handcuff Plaintiff and did not damage his television or remove deodorant from his cell, but does not speak to any events prior to the cell search. (*Id.*) The next day, Sergeant Hampton filed a Rules Violation Report ("RVR") at Defendant Navarro's request charging Plaintiff with behavior which could lead to violence. (*Id.*) Defendant Navarro states that the RVR was based on the need to insure Plaintiff complies with CDCR rules which serve to protect him, correctional staff, and the security of the institution, and was filed without animus. (*Id.*) He did not become aware Plaintiff had filed an inmate grievance against him in connection to the July 26 incident until several weeks later, which was when he first learned Plaintiff complained he had been handcuffed behind his back despite a medical chrono authorizing waist chains. (*Id.*)

Defendant Navarro states that on August 2, 2016, he was performing a search of the common areas and monitoring the return of inmates from the evening meal when he observed Plaintiff walk up the steps to the second tier toward his cell. (*Id.* at 3.) When Plaintiff reached the second tier, he picked up a 35-gallon trash can and threw it onto the lower tier. (*Id.*) It landed about seven feet from Defendant Navarro and correctional officer Martin. (*Id.*) Defendant Navarro states that Plaintiff became an immediate security threat by throwing the trash can and therefore needed to be taken into custody and removed from the housing unit. (*Id.*) He ordered Plaintiff to get down and submit to handcuffs, and activated his personal alarm when Plaintiff did not comply. (*Id.*) Defendant Navarro and correctional officer Martin approached Plaintiff, who only then complied with the order to get down. (*Id.*)

Defendant Navarro states that he handcuffed Plaintiff and conducted a clothed body search for weapons and contraband and found none. (*Id.*) As he was escorting Plaintiff to the lower B shower area, Plaintiff suddenly lunged head first toward Defendant Navarro's face almost striking him in the head. (*Id.*) Plaintiff tried to break free from Defendant Navarro's grasp by aggressively twisting his upper body from side to side while Defendant Navarro yelled commands for him to stop and get down. (*Id.*) He grabbed Plaintiff by his

shirt near his upper left arm and shoulder and forced him to the ground into a prone position. (*Id.*) Once Plaintiff was on the ground, other officers took custody of him and escorted him away. (*Id.*) Defendant Navarro filed an RVR on August 3, 2016, charging Plaintiff with assault on a peace officer likely to cause great bodily injury. (*Id.*) He denies having any motive or intent to harm Plaintiff, denies choking him, and states that he used only that amount of force necessary to control him. (*Id.*) He states that he was not present during the January 16, 2017, incident with the other Defendants, was not involved in that incident, and never asked or directed anyone to harass or injure Plaintiff. (*Id.*)

Defendant Navarro also presents the declaration of Hector Florendo, a Psychiatric Technician at RJDCF, who states that his duties include administering medication and assessing the mental and physical condition of inmates in connection to injuries or uses of force. (ECF No. 111-3 at 2.) He performed a medical assessment of Plaintiff on August 2, 2016, immediately following the incident with Defendant Navarro, which revealed Plaintiff was ambulatory and uninjured. (*Id.* at 2-3.) When questioned about his condition, Plaintiff reported he was "good," and Florendo found no need to refer him for further medical care. (*Id.* at 3.) Defendant Navarro also presents the declaration of his attorney, who deposed Plaintiff and attaches excerpts of Plaintiff's deposition transcript to her declaration. (ECF No. 111-4 & Ex. A.)

### 2. Defendants Romero and Valdovino's Motion for Summary Judgment

Defendants Romero and Valdovinos present their own declarations, as well as declarations from a correctional officer and a nurse at RJDCF. (ECF No. 116.) Defendant Romero states that on January 16, 2017, he was processing inmates into the dining hall when Plaintiff approached him "at approximately 7:30 a.m. and aggressively said to me, 'give me my mothafuckin food nigga!'" (ECF No. 116-8 at 1-2.) Defendant Romero states that he checked the pre-printed list of inmates who were authorized to receive kosher meals, and because Plaintiff's name was not on the list, Defendant Romero had no authority to allow him to be served a kosher meal. (*Id.* at 2.) He instructed Plaintiff to enter the dining room and receive a regular meal, but Plaintiff "quickly advanced towards me and yelled at

me, 'fuck you and fuck your tray nigga!'" (*Id.*) Plaintiff then swung his left fist at Defendant Romero's face but did not make contact. (*Id.*) Plaintiff then swung his right fist at Defendant Romero, hitting him in the upper chest. (*Id.*) He ordered Plaintiff to get down but Plaintiff ignored the order. (*Id.*)

Defendant Romero states that he feared for his safety and the safety of other correctional staff and inmates in the area, and in order to prevent a further attack by Plaintiff he stepped back, unholstered his state-issued OC spray device and disbursed a three-second burst in Plaintiff's face from about three feet away. (*Id.*) Only then did Plaintiff comply with the order to get down into a prone position. (*Id.*) Defendant Romero states that Defendant Valdovinos then placed Plaintiff in handcuffs and removed him from the area, while Defendant Romero went to the Triage Treatment Area where he received a medical evaluation which noted pain and redness on his chest. (*Id.*)

Defendant Romero states that he was not involved with Plaintiff's decontamination from the OC spray, he did not use force with a sadistic or malicious intent to cause him harm, pain or injury, he acted at all times in furtherance of a legitimate penological purpose to maintain safety and security and to protect himself and others, and he has no personal animosity toward Plaintiff. (*Id.* at 2-3.) He states he did not retaliate against Plaintiff for filing an inmate appeal against Defendant Navarro and was not aware of any such appeal. (*Id.*) He wrote an RVR charging Plaintiff with battery on a peace officer, and states that Plaintiff refused to attend the hearing and was found guilty and assessed 150 days loss of good-time credit. (*Id.*) Plaintiff's CDCR file shows the January 16 incident was his third offense for battery on a peace officer or battery on a non-prisoner. (*Id.*)

Defendant Valdovinos states in his declaration that he was stationed at the front of the culinary line monitoring inmates entering the dining hall for their morning meal on January 16, 2017, when, about 7:30 a.m., he saw Plaintiff approach Defendant Romero and demand a kosher meal. (ECF No. 116-10 at 1.) He heard Defendant Romero tell Plaintiff he was not on the kosher meal list but could enter the dining room for a regular meal. (*Id.* at 2.) Plaintiff yelled: "Give me my mothafuckin food nigga!" (*Id.*) Plaintiff then

aggressively moved toward Defendant Romero and punched him in the chest with his right fist. (*Id.*) Defendant Valdovinos states that he and Defendant Romero both ordered Plaintiff to the ground but he ignored them. (*Id.*) He saw Defendant Romero step back, unholster his state-issued MK-9 OC spray device, and disburse a three-second burst of spray from about three feet away which struck Plaintiff in the face. (*Id.*) Plaintiff assumed the prone position and Defendant Valdovinos handcuffed him behind his back. (*Id.*) Defendant Valdovinos states that he was unaware Plaintiff had any medical restrictions requiring him to be handcuffed with his hands in front. (*Id.*)

Defendant Valdovinos pulled Plaintiff to his feet and escorted him to the Facility C gym, allowing him to decontaminate from the OC spray with fresh air on the way. (*Id.*) When they arrived at the gym, Defendant Valdovinos offered Plaintiff "the opportunity to decontaminate from the OC spray with cool running water," but Plaintiff "voluntarily declined, stating 'No, I'm good, and when I get back I'm going to get C/O Romero.'" (*Id.* at 3.) Defendant Valdovinos states that at 7:38 a.m., LVN Ominigbo arrived to conduct a healthcare assessment of Plaintiff, at which time Defendant Valdovinos released Plaintiff from his handcuffs and placed him in a holding cell. (*Id.*)

Defendant Valdovinos started a Holding Cell Log to document Plaintiff's condition, which he attaches as Exhibit A to his declaration. (*Id.*) He states the log shows that correctional officer Barrozo checked on Plaintiff's welfare every fifteen minutes while he was in the holding cell until he was released at 10:10 a.m., and that Plaintiff refused decontamination prior to being placed in the cell. (*Id.*) Defendant Valdovinos states that he did not use force on Plaintiff with a malicious or sadistic intent, that he acted with the legitimate penological purpose to maintain safety and securing of the institution and protect himself, has never had any personal animosity toward Plaintiff, and did not retaliate against him for filing inmate grievances against Defendant Navarro as he was unaware of any such filings. (*Id.* at 3-4.)

Defendants Romero and Valdovinos also present the declaration of E. Ominigbo, a Licensed Vocational Nurse, who states that he was on duty at RJDCF on January 16, 2017,

when, about 7:35 a.m., he was called to medically evaluate Plaintiff. (ECF No. 116-6 at 2.) Nurse Ominigbo states it was evident Plaintiff had been exposed to OC spray, "but had no other injuries and did not complain of any other injures, and he needed no further medical treatment." (*Id.*) LVN Ominigbo further states that Plaintiff "had been offered an opportunity to decontaminate, and he was decontaminated by being removed from the area where the OC spray was used, and exposed to fresh air. I also specifically instructed inmate Jackson on self-decontamination techniques." (*Id.*)

Defendants present the declaration of correctional officer M. Barrozo, who states that Defendant Valdovinos placed Plaintiff in a holding cell and started a "holding cell log to document [Plaintiff's] well being while he was in the holding cell." (ECF No. 116-4 at 2.) Correctional officer Barrozo states that the holding cell log, attached as an exhibit to his declaration, indicates that Defendant Valdovinos checked on Plaintiff at 7:55 a.m., and correctional officer Barrozo then took over monitoring Plaintiff. (*Id.*) He states the log indicates he routinely checked on Plaintiff's welfare while he was in the holding cell until Plaintiff was escorted to the Administrative Segregation Unit at 10:10 a.m. (*Id.*)

### 3. Plaintiff's Opposition

Plaintiff attaches his own declaration to his Opposition, stating that he went to the dining hall on July 26, 2016, to retrieve the one hot meal he receives every day but was served a cold kosher meal, and then returned to his cell and covered his window with cardboard in order to speak with the sergeant of the Facility C Enhanced Outpatient Program to discuss receiving cold meals. (ECF No. 126 at 55.) However, Defendant Navarro and another correctional officer "without any inkling opened the cell door," and Defendant Navarro stood in the door with his OC spray unholstered and threatened to spray if he did not submit to rear handcuffs. (*Id.*) Plaintiff warned Defendant Navarro he had a medical order for waist restraints "because rear-cuffing was painful in light of my physical condition," but Defendant Navarro's "response was for me to step out or he would 'spray my black ass.'" (*Id.*) He states that Defendant Navarro refused to honor his waist restraint order, handcuffed him with his hands behind his back, and led him to a shower. (*Id.*)

Defendant Navarro then placed him in the shower, locked the door, and ordered him to stick his hands though the port. (*Id.*) Defendant Navarro removed the handcuffs and conducted an unclothed body search. (*Id.*) As he was being searched, Defendant Navarro said: "Yea I see you like to write up officers. Well the RJD Facility C officers were dirty cops and they will set me up and do whatever they have to do to get me off the yard." (*Id.*) Plaintiff states Defendant Navarro left him in the shower as he joined the other officer in searching his cell, and when Defendant Navarro returned he once again handcuffed him with his hands behind his back.[2] (*Id.* at 56.)

Defendant Navarro led Plaintiff back to his cell, placed him inside, closed the door and ordered him to put his hands out the food port to be uncuffed, which "was painful as I suffer from a painful physical condition." (*Id.*) He states that: "I noticed my cell was in disarray and my television was broken and my sodas and deodorant was missing." (*Id.*) He filed a 602 inmate appeal about the incident on July 27, 2016, and states that: "Navarro was made aware of this by sergeant D. Hampton, who then devised a plan to retaliate against me by issuing a false Rules Violation Report." (*Id.*)

Plaintiff states that on August 2, 2016, he was released for evening meal service after having constantly complained to the correctional staff that his evening kosher meal which was supposed to be served hot was being served cold. (*Id.* at 56-57.) When he picked up his meal and found it was cold: "I became frustrated and upset and tore the meal into pieces

_____

[2] Plaintiff's declaration is signed under penalty of perjury. (*Id.* at 62.) To the extent the allegations contained therein are within his personal knowledge it is treated as an affidavit in opposition to the summary judgment motion. *Schroeder v. McDonald*, 55 F.3d 454, 460 & nn. 10-11 (9th Cir. 1995). His SAC and Opposition are not signed under penalty of perjury and will not be so treated, leaving only his declaration and deposition testimony available to act as affidavits in opposition to summary judgment. *See Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004) ("[B]ecause Jones is pro se, we must consider as evidence in his opposition to summary judgment all of Jones's contentions offered in motions and pleadings, where such contentions are based on personal knowledge and set forth facts that would be admissible in evidence, and where Jones attested under penalty of perjury that the contents of the motions or pleadings are true and correct.")

17cv0882-CAB (BLM)

and threw the meal on the ground in front of the facility C dining hall then returned to housing unit 14." (*Id.* at 57.) Defendant Navarro and correctional officer Martin were seated at a podium in the middle of the unit, and Plaintiff states that as he walked up the stairs to his cell: "I grabbed a trash can sitting atop of the stairs and tossed it over the tier in the opposite direction nowhere near the direction of Navarro and Martin, the trash can landed near the (A) and (B) prisoner telephones where the trash littered the ground." (*Id.*) Defendant Navarro "walked alone towards the bottom of the stair case and gave verbal orders for me to come down and 'pick up the trash.'" (*Id.*) Defendant Navarro "again stated 'pick it up,' I refused and replied: 'I'm not picking up shit.'" (*Id.*) Defendant Navarro activated his alarm and told Plaintiff to get down, and he complied. (*Id.*) When Defendant Navarro ordered him to place his hands behind his back to be handcuffed, Plaintiff "warned Navarro that I have a physical condition that requires me to be waist restrained," but Defendant Navarro "aggressively positioned my hands to rear-cuff me from behind and stated that 'he did not care.'" (*Id.*) Defendant Navarro handcuffed him, ordered him to stand up, and said: "Yea, I got you now, you threw the trash can at me," as he escorted Plaintiff down the stairs. (*Id.* at 57-58.) Plaintiff states that:

> In response to what Navarro said I replied and said something Navarro did not like. Navarro became infuriated and therefore attempted to trip me while I was subdued so that I would fall on my face. However, Navarro was unsuccessful and had fallen on the ground instead of me as inmates watched and laughed at Navarro he spontaneously stood up and placed his arm around my neck choking me to the ground. While lying on the ground Navarro placed his knee into my back kneeling on one knee utilizing all of his body weight further injuring me. I yelled and screamed for Navarro to get off my back while squirming and wiggling I shook Navarro off, during that time Navarro stated "file your paperwork now."

(*Id.* at 58.)

Plaintiff states he was then stood up and walked a short distance where correctional officer Delgado took custody of him and asked if he was okay. (*Id.*) He claims Defendant Navarro issued a false RVR for assault on a peace officer "in retaliation [for Plaintiff] filing grievances." (*Id.* at 59.)

Plaintiff states that after a brief stay at another institution he returned to RJDCF on January 13, 2017. (*Id*.) On January 16, 2017, he was released for his morning meal to the dining hall and attempted to receive his kosher meal. (*Id*.) When he told correctional officer Hodges he had been approved for a kosher meal, his "response was that I start over from the beginning and file a CDCR form 3030." (*Id*.) He asked officer Hodges to contact the on-sight culinary food manager, but: "Hodges refused to assist me and responded 'that he helped me the last time when I arrived at RJD but was not going to do so this time.'" (*Id*.) Defendant Romero told Plaintiff "you can get a tray," to which Plaintiff responded that his religious dietary laws precluded him from eating a tray. (*Id*. at 60.)

As Plaintiff was walking away, Defendant Valdovinos stated: "Get the fuck out of here." (*Id*. at 60.) Plaintiff states: "I was startled and abruptly turned around surprised at being disrespected blatantly and responded 'what!'" (*Id*.) Defendant Romero "instantly whipped out his MK-9 oleoresin spray from about three feet away and began spraying me directly in my face. I did not strike Romero nor did I resist or disobey him this was an unprovoked attack." (*Id*.) Plaintiff states that he was blinded by the OC spray "and immediately went down to the ground trying to cover up as Romero and Valdovinos began to pounce on me by punching and kicking me. I was then poked in the eye with a madock baton while Romero simultaneously broke my pinky finger and destroyed both left and right wrist braces (medical appliances) I wore." (*Id*.) Plaintiff states he:

> was handcuffed from behind and forcefully lifted to my feet and placed into a maneuver called the chicken wing and escorted forcefully to the gym and I asked to be decontaminated by Romero and Valdovinos but [they] denied me and placed me into holding module #1 where I was restricted from any form of air flow, the handcuffs were left on me and never taken off as I was in pain and burning up I could not breathe and asked LVN Ominigbo to receive my asthma inhaler and to be decontaminated.

(*Id*. at 60-61.)

Plaintiff states that he heard Defendants Romero and Valdovinos "boasting about beating me to the surrounding correctional officers, they stated the beating was in retaliation for filing paperwork for Navarro injustices." (*Id*. at 61.) He states: "I heard

Valdovinos exclaim 'yea you punched my partner,' then Romero blurt out, 'Yea you should not have come back' and 'you should have never been placed on Facility C after what happened with Navarro.' Romero stated 'its ok because this time he would make sure that I did not come back.'" (*Id.*) He was placed in a holding module by Defendant Valdovinos, who left him there and did not return. (*Id.*) Plaintiff states:

> I was now being observed [by] officer Barrozo. I asked her if I could be decontaminated, have a restroom break and the handcuffs removed, and a drink of water, as well as my asthma inhaler but was denied officer Barrozo ignored me. [¶] I after sometime of being handcuffed from behind and in pain in light of my physical condition maneuvered the handcuffs from behind me to the front and began to urinate on myself and attempted to use the urine soaked jacket I had hanging over the handcuffs on my face to try and relieve the burning. I then was moved to administrative segregation at about 10:00 a.m. by officers Lopez and Barrozo. [¶] I arrived at B-facility administrative segregation and was allowed to shower. Romero and Valdovinos charged [me] with a false Rules Violation Report for battery on a peace officer. I never struck or touched Romero.

(*Id.* at 61-62.)

Plaintiff submits a declaration from inmate Michael Holland, who states he observed Plaintiff throw a trash can toward the telephones and refuse Defendant Navarro's order to pick it up. (*Id.* at 89-90.) Inmate Holland saw "officer Navarro attempt to trip Duwayne Jackson, but he failed and fell down himself. The officer then jumped up and began using a choke hold around Duwayne Jackson's throat and pulled him down. I did not see Duwayne Jackson resist or anything while Duyane Jackson was down on the ground I seen officer Navarro use his knee and put his weight on Duwayne Jackson's back. Duwayne Jackson shook him off and another officer [escorted Plaintiff out of the building]." (*Id.* at 91-92.)

Plaintiff submits a declaration from inmate Melvin Coilton who states that on or about January 17 or 18, 2017, he overheard Defendant Navarro speaking to several yard officers "about assaulting [Plaintiff]." (*Id.* at 94-95.) He heard Defendant Romero "say how come his dumb ass could come back to this yard and not know we would whip his ass

and send him back to ad-seg with battery on staff. They then began to laugh and c/o Navarro stated he should know not to test the big boys and laughed." (*Id*. at 95.)

Plaintiff submits a declaration from inmate Charles Williams who states that about 7:30 a.m. on January 16, 2017, he "witnessed [Plaintiff] being pepper-sprayed directly in the face by c/o Romero and shortly after physically beaten by c/o Romero and c/o Valdovinos." (*Id*. at 96-97.) He states: "I heard both c/o Romero and c/o Valdovinos saying 'fuck you Jackson how does it feel to get beat like a bitch.'" (*Id*. at 97.)

Finally, Plaintiff submits a declaration from inmate Derek Harmon who states that Defendant Navarro broke Plaintiff's television but does not say how he acquired that knowledge. (*Id*. at 99.) He states he was housed in the RJDCF mental health Enhanced Outpatient Program in a cell located below Plaintiff's cell on July 26, 2016, and on that day he heard a trash can being thrown from the tier in the opposite direction of Defendant Navarro, saw Defendant Navarro stand up and heard him yell at Plaintiff to pick it up, and heard Plaintiff refuse. (*Id*. at 99-100.) He heard Plaintiff tell Defendant Navarro he had a medical chrono requiring waist chains and complaining about being handcuffed due to his hand injury, and heard Defendant Navarro reply he did not care. (*Id*. at 100.) Inmate Harmon states that as Defendant Navarro was escorting Plaintiff down the stairs he heard Defendant Navarro say "now I got your ass you threw a trash can at me." (*Id*.) He states that: "I seen officer Navarro try and use a slam tactic on Jackson, but he fell down on his right knee to the ground and spontaneously got up and used his right arm to choke Jackson to the ground while he was handcuffed. At that point officer Navarro began to use all of his weight by using his right knee driving it into Jackson's back. I seen Jackson squirm around on the ground and officer Navarro get up and Jackson being on the ground with another officer who took control." (*Id*.)

### 3. Defendant Navarro's Reply

Defendant Navarro replies that even accepting Plaintiff's version of the facts as true, there is no genuine issue of material fact in dispute with respect to an Eighth Amendment excessive force claim because it is uncontroverted that Plaintiff was not injured by the *de*

*minimis* use of force. (ECF No. 131 at 3-6, citing *Wilkins v. Gaddy*, 559 U.S. 34, 38 (2010) ("An inmate who complains of a 'push or shove' that causes no discernible injury almost certainly fails to state a valid excessive force claim.")) Defendant Navarro argues there is no evidence of retaliation because Plaintiff admitted in his deposition he was unable to identify the correctional officer who told Defendant Navarro that Plaintiff had filed an inmate grievance against him, and although he identifies that person as Sergeant Hampton for the first time in his declaration in opposition to summary judgment, he cannot create a triable issue of fact by contradicting his prior sworn testimony in his motion papers. (*Id.* at 6-7.) He argues that Plaintiff fails to show how Defendant Navarro was aware of his July 27 grievance, and that Plaintiff's new contention in his Opposition that the retaliation was based on different inmate grievances other than the July 27 grievance contradicts the allegations in the SAC as well as his sworn deposition testimony. (*Id.* at 8-10.)

Defendant Navarro objects to statements in Plaintiff's declaration that: (a) there was no legitimate basis for opening his cell door, on the basis that covering the cell door window is a violation of prison rules, (b) Defendant Navarro "refused to honor his medical chrono" for waist chains, on the basis that it is undisputed Plaintiff did not show Defendant Navarro a medical chrono, (c) Sergeant Hampton informed Defendant Navarro of Plaintiff's inmate grievances, on the basis that Plaintiff does not identify the basis for such knowledge and it contradicts his sworn deposition testimony that he does not know who informed Defendant Navarro of his inmate grievance, (d) the RVR issued by Defendant Navarro was false and retaliatory, as a legal conclusion and lacking foundation, (e) Defendant Romero and Valdovinos beat him in retaliation for his filing grievances against Defendant Navarro, as lacking foundation, and (f) he did not break any prison rules or resist, threaten or delay the officers in their duties, as vague and ambiguous as to time and containing false statements. (ECF No. 131-3 at 1-5.) He objects to inmate Coilton's declaration as failing to state how he recognized Defendant Navarro's voice (ECF No. 131-4 at 1), to inmate Holland's declaration as failing to identify where he was located during the events (ECF No. 131-5 at 1-2), and to inmate Harmon's declaration as failing to

establish how he knows Defendant Navarro broke Plaintiff's television and took property from his cell. (ECF No. 131-6 at 1-2.) He also argues that because Plaintiff never cites the declarations by Coilton and Holland in his moving papers, "plaintiff affords no weight to the opinions, and neither should this Court." (ECF No. 131-4 at 2; ECF No. 131-5 at 2.)

## C. Defendant Navarro is entitled to summary judgment.

The Court finds that Defendant Navarro is entitled to summary judgment on all claims because Plaintiff has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. Specifically, Plaintiff has not identified evidence from which a jury could find Defendant Navarro: (1) was aware of a serious medical need and denied or interfered with Plaintiff's access to medical care, (2) took adverse action against Plaintiff because of his protected activity which did not reasonably advance a legitimate correctional goal, and (3) inflicted unnecessary and wanton pain and suffering by using force in a malicious and sadistic manner.

### 1. Medical claims against Defendant Navarro[3]

The Eighth Amendment's cruel and unusual punishments clause is violated when prison officials are deliberately indifferent to a prisoner's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 102-05 (1976). To establish deliberate indifference, Plaintiff must point to evidence in the record from which a trier of fact might reasonably conclude that the treatment he received placed him at risk of "objectively, sufficiently serious" harm, and that a prison official had a "sufficiently culpable state of mind" when they provided or denied medical care. *Wallis v. Baldwin*, 70 F.3d 1074, 1076 (9th Cir. 1995).

Plaintiff must show Defendant Navarro knew of and disregarded "an excessive risk to inmate health or safety; the official must both be aware of the facts from which the

---

[3] The SAC clearly alleges that Plaintiff's need for medical care was interfered with or denied by Defendants Romero and Valdovinos, but it is unclear whether it presents such allegations against Defendant Navarro. Out of an abundance of caution the Court will liberally construe the SAC as presenting such a claim against Defendant Navarro.

inference could be drawn that substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Inadequate medical treatment, medical malpractice, or even gross negligence by itself does not rise to that level, as "the Eighth Amendment proscribes 'the unnecessary and wanton infliction of pain,' which includes those sanctions that are 'so totally without penological justification that it results in the gratuitous infliction of suffering.'" *Hoptowit v. Ray*, 682 F.2d 1237, 1246 (9th Cir. 1982), overruled on other grounds by *Sandin v. Conner*, 515 U.S. 472 (1995), quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). Prison officials may be deliberately indifferent to a prisoner's serious medical needs if they "deny, delay or intentionally interfere with medical treatment." *Hunt v. Dental Dep't.*, 865 F.2d 198, 201 (9th Cir. 1989). Plaintiff must show the prison official's deliberate indifference caused him harm. *Jett v. Palmer*, 439 F.3d 1091, 1096 (9th Cir. 2006).

The undisputed evidence shows Defendant Navarro was not involved in any way with the medical care Plaintiff received. Plaintiff does not allege he required medical attention after the July 26 incident, and it is undisputed that he was examined by medical personnel after the August 2 incident and did not report any injuries or any need for medical care. As discussed below in connection to his claim of excessive force, Plaintiff does not identify any injuries as a result of his encounters with Defendant Navarro, only that he suffered temporary pain in his hand and back. Plaintiff has presented no evidence whatsoever from which a jury could reasonably find that Defendant Navarro denied or delayed his access to medical care. *See McGuckin v. Smith*, 974 F.2d 1050, 1060 (9th Cir. 1992) (holding that with respect to denial or delay of prison medical care, "[a] defendant must purposefully ignore or fail to respond to a prisoner's pain or possible medical need in order for deliberate indifference to be established."), overruled on other grounds by *WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc); *Hoptowit*, 682 F.2d at 1246; *Farmer*, 511 U.S. at 837.

Plaintiff has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof

at trial," namely, that Defendant Navarro denied or delayed medical care, or was aware that his failure to provide Plaintiff with medical care caused a substantial risk of harm. *Celotex Corp.*, 477 U.S. at 322. With respect to an Eighth Amendment deliberate indifference to medical care claim against Defendant Navarro, Plaintiff has not shown a "fairminded jury could return a verdict for him on the evidence presented." *Anderson*, 477 U.S. at 255. Accordingly, the Court **GRANTS** summary judgment in favor of Defendant Navarro on that claim.

### 2. Plaintiff's retaliation claims against Defendant Navarro

"Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005). "Prisoners have a First Amendment right to file grievances against prison officials and to be free from retaliation for doing so." *Watison v. Carter*, 668 F.3d 1108, 1114 (9th Cir. 2012); *see also Gomez v. Vernon*, 255 F.3d 1118, 1127 (9th Cir. 2001) ("[A] retaliation claim may assert an injury no more tangible than a chilling effect on First Amendment rights.")

With respect to the July 26 incident, Plaintiff alleges in the SAC that Defendant Navarro opened his cell door without warning in violation of prison regulations. (ECF No. 37 at 4.) He stated in his inmate grievance regarding that incident that correctional officer Smith opened his cell door, not Defendant Navarro. (*Id*. at 28.) Defendant Navarro contends that opening the cell door was appropriate because covering a cell window is a violation of prison rules. (ECF No. 131-3 at 2.) Plaintiff stated in his deposition that covering his cell window was not against prison rules, but provided no support for that contention. (ECF No. 111-4 at 11.) In fact, he stated in his deposition that he covered his window because he expected it would cause "a disturbance going on in prison." (*Id*. at 12.) There is no genuine issue of material fact in dispute whether Defendant Navarro's actions

of opening Plaintiff's cell door, ordering him out of his cell, and searching the cell in response to covering the cell window, "did not reasonably advance a legitimate correctional goal." *Rhodes*, 408 F.3d at 568; *see also Foster v. Runnels*, 554 F.3d 807, 813-14 (9th Cir. 2009) ("[T]here is no doubt that the [prison] had an institutional policy prohibiting inmates from covering their cell windows or that requiring an unobstructed view into an inmate's cell serves a legitimate penological interest."); *see e.g. Robins v. Lamarque*, 2011 WL 6181435 at *5 (N.D. Cal. 2011) (use of smoke grenades and pepper spray to extract inmates from cell who had covered their cell windows did not violate the Eighth Amendment).

Plaintiff states in his declaration that Defendant Navarro handcuffed him behind his back on July 26 despite Plaintiff telling him that he had a medical chrono not to be handcuffed from behind. (ECF No. 125 at 55.) Defendant Navarro states in his declaration that he did not handcuff Plaintiff. (ECF No. 115-5 at 2.) He argues it is undisputed Plaintiff never showed him a medical chrono preventing him from being handcuffed from behind, but he does not dispute Plaintiff's allegation that he told Defendant Navarro he had such an order. (ECF No. 131-3 at 2.) A credibility determination in that regard is unnecessary because Plaintiff has submitted a copy of his medical chrono, which orders special cuffing only for non-emergency escort or transportation. (ECF No. 37 at 139.) Plaintiff admits he created an emergency by covering his cell window on July 26, as he testified in his deposition that he covered his cell window to draw a reaction from correctional officials in protest of not receiving a hot meal, and that he expected it to cause a disturbance in the prison. *See e.g. Cottrell v. Wright*, 2012 WL 3535838 at *8 (C.D. Cal. 2012) ("covering cell windows created a threat to plaintiff and prison staff as it made it impossible to view plaintiff's actions within his cell.") Viewing the evidence in the light most favorable to Plaintiff, there is no genuine issue of material fact in dispute whether Defendant Navarro's actions of handcuffing Plaintiff on July 26, assuming he did so, "did not reasonably advance a legitimate correctional goal." *Rhodes*, 408 F.3d at 568.

Plaintiff states that Defendant Navarro escorted him to the shower, removed the handcuffs, and while conducting an unclothed body search said: "I see you like to write up

officers. Well the RJD Facility C officers were dirty cops and they will set me up and do whatever they have to do to get me off the yard." (ECF No. 126 at 55.) "[T]he mere *threat* of harm can be an adverse action, regardless of whether it is carried out because the threat itself can have a chilling effect." *Brodheim v. Cry*, 584 F.3d 1262, 1271 (9th Cir. 2009) ("The power of a threat lies not in any negative actions eventually taken, but in the apprehension it creates in the recipient of the threat.") Even if the statement Defendant Navarro allegedly made evinces a retaliatory motive, as set forth above, Plaintiff has not established Defendant Navarro's alleged "adverse actions" on July 26 "did not reasonably advance a legitimate correctional goal." *Rhodes*, 408 F.3d at 567-68. Plaintiff cannot maintain an independent claim based merely on the threat. *See Gaut v. Sunn*, 810 F.2d 923, 925 (9th Cir. 1987) ("[I]t trivializes the Eighth Amendment to believe that a [mere] threat constitutes a constitutional wrong.")

Plaintiff states that on July 27 he filed a 602 inmate appeal "about the [July 26] incident," and that Defendant "Navarro was made aware of this by sergeant D. Hampton, who then devised a plan to retaliate against me by issuing a false Rules Violation Report." (ECF No. 126 at 55.) A copy of the inmate grievance is attached as Exhibit A to Plaintiff's declaration. (*Id*. at 26-35.) Defendant Navarro states that he was not aware Plaintiff had filed an inmate grievance against him until several weeks later, which was when he first learned Plaintiff was complaining he had been handcuffed behind his back despite a chrono authorizing waist chains. (ECF No. 111-5 at 2.) There is no need for a credibility determination in this regard because Plaintiff does not indicate in his declaration how he became aware that Sergeant Hampton told Defendant Navarro about the inmate grievance. In addition, Plaintiff testified in his deposition that he did not know which officer told Defendant Navarro about his July 27 grievance, and that he had inferred such knowledge because Defendant Navarro told him during the August 2 incident to "start your paperwork now," despite Plaintiff admitting at his deposition that correctional officers use that phrase and similar phrases "all the time." (ECF No. 111-4 at 64-65.) Defendant Navarro argues that Plaintiff cannot create a triable issue with a new contention in his Opposition by

contradicting his earlier deposition testimony. (ECF No. 131 at 6-7.) Plaintiff attaches a copy of the July 27 RVR to his Opposition, which he alleges Defendant Navarro falsely filed against him in "a plan to retaliate against me" (ECF No. 126 at 56), and which states:

> This report was written on behalf of Officer O. Navarro. On Tuesday July 26, 2016, at approximately 2000 hours, while performing my duties as Housing Unit C14 floor officer #2, I was issuing a cell search receipt to Inmate Jackson J-41016 C14-206L. Inmate Jackson became belligerent towards me. I ordered Inmate Jackson to lock up in his assigned cell with negative results. Inmate Jackson stated to me "FUCK YOU PIG," "YOU ARE A PIECE OF SHIT." I ordered him to lock up again with negative results. Inmate Jackson then stated "FUCK YOU BITCH." This means war against the cops bitch. You will see. I ordered him to lock up again with positive results. As Inmate Jackson was walking away he continued in a loud voice calling me a bitch. Inmate Jackson then returned to his cell.

(*Id*. at 68.)

A hearing was held on the RVR on February 21, 2017, at which Plaintiff pleaded not guilty. (*Id*. at 69.) He was found guilty of behavior which could lead to violence. (*Id*.)

Plaintiff states in his declaration that after the August 2 incident Defendant Navarro issued a second false RVR for assault on a peace officer "in retaliation of me filing grievances." (*Id*. at 59.) A copy of the RVR is attached to Defendant Navarro's declaration as Exhibit A, and contains his statement:

> On Tuesday, August 2, 2016, at approximately 1840 hours, while conducting my duties as Housing Unit 14 Floor 2 [officer], while supervising Housing Unit 14 dinner meal, I observed Inmate (I/M) Jackson (J41016 C14-206L) returning from the dinner meal. As I/M Jackson was walking up to his assigned cell, he picked up a trash can from upper A section and threw it towards my area, landing approximately 7 feet. I ordered I/M Jackson to get down and cuff up. He did not comply and I activated my personal alarm. Officer Martin and I approached I/M Jackson and conducted a clothed body search for contraband, weapons as well as the surrounding area with negative results. I proceeded to escort I/M Jackson to lower B shower, as we approached lower B dayroom, I/M Jackson became belligerent and suddenly lunged head first toward my facial area in an aggressive manner, almost striking my facial area with his head. I/M Jackson was trying to break away from my grip by aggressively twisting his upper body side to side. During

this time, I was yelling commands for I/M Jackson to stop and get down. I grabbed I/M Jackson with both my hands by his upper left arm/shoulder state issued shirt and forced I/M Jackson forward and to the ground (into a prone position) by utilizing my body weight. Once on the ground, I/M Jackson complied with all of my orders. Responding staff then arrived, took custody of I/M Jackson and escorted him away from the area.

(ECF No. 111-5 at 6.)

A hearing was held on the RVR on February 21, 2017, which Plaintiff attended. (*Id.* at 9-10.) He was found guilty of assault on a peace officer by means likely to cause great bodily injury. (*Id.* at 16.)

Finally, Plaintiff states that on January 16, 2017, he heard Defendants Romero and Valdovinos "boasting about beating me to the surrounding correctional officers they stated the beating was in retaliation for filing paperwork for Navarro injustices." (ECF No. 126 at 61.) He states he heard Defendant Romero say "you should not have come back" and "you should have never been placed on Facility C after what happened with Navarro," and "this time he would make sure that I did not come back." (*Id.* at 61-62.) Plaintiff was issued an RVR charging him with battery on a peace officer as a result of that incident. (ECF No. 116-9 at 6-8.) That RVR contains Defendant Romero's statement:

On Monday, January 16, 2017, at approximately 0730 hours, while performing my duties as the Facility C Security Patrol 4, while processing inmates in to the Facility C Dining Hall #2. I was approached by Inmate Jackson, D (J41016, FC-13-131L) and stated: Give me my mothafuckin food nigga!" I advised Inmate Jackson he was not on the kosher list and to enter Dining Hall #2 and retrieve a breakfast tray. Inmate Jackson advanced towards me and stated, "Fuck you and fuck your tray nigga!" Inmate Jackson swung his left fist towards my facial direction with negative contact. Inmate Jackson then swung his right fist making contact, striking my upper chest area. I gave Inmate Jackson clear verbal orders to get down with negative results. Fearing for my safety and to prevent further attack from Inmate Jackson's swinging his fist, I instinctively stepped back unholstered my state issue MK-9 Oleoresin Capsicum Spray, standing from approximately three (3) feet away, I disbursed one three (3) second burst, aiming and striking Inmate Jackson's facial area. Inmate Jackson complied and assumed a prone position. Officer G. Valdovinos placed Inmate Jackson in handcuffs and removed him

> from the affected area. I proceeded to the Triage Treatment Area (TTA), where I received a Medical Evaluation (CDCR 7219), noting pain and redness on my chest. I was offered PEER support by my immediate supervisor to which I declined. This concludes my involvement in this incident.

(*Id*. at 6.)

A hearing was held on February 26, 2017, the report of which states Plaintiff refused to attend and that a not guilty plea was entered on his behalf. (*Id*. at 9, 13-14.) He was found guilty of battery on a peace officer. (*Id*.) Plaintiff states: "I was denied an opportunity to appear at the RVR hearing on February 26, 2017 as officer Palacios appeared at the cell door as I used the restroom. I asked her to give me one moment and she never returned. I notified the sergeant but was informed it was too late." (ECF No. 126 at 62.)

There is no genuine issue of material fact in dispute regarding whether Defendant Navarro is liable for retaliation arising from the alleged actions of Defendants Romero and Valdovinos. A person deprives another of a constitutional right under section 1983 where that person "does an affirmative act, participates in another's affirmative acts, or omits to perform an act which [that person] is legally required to do that causes the deprivation of which complaint is made." *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978). "The requisite causal connection can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." *Id*. at 743-44. Although inmate Coilton states in his declaration that on January 17 or 18, he heard Defendant Navarro laugh when Defendant Romero said Plaintiff should have known better than to come back to Facility C, and he heard Defendant Navarro then say that Plaintiff "should know not to test the big boys" (ECF No. 126 at 94-95), there is no evidence in the record before the Court that Defendant Navarro played any direct role in the January 16 incident, or that he could have reasonably foreseen his actions on July 26 and August 2 would have motivated Defendants Romero and Valdovinos to retaliate against Plaintiff with the alleged unnecessary use of force.

With respect to the August 2 incident, Plaintiff's allegation that Defendant Navarro said "start your paperwork now" after he took Plaintiff to the ground on August 2, even when viewed in the light most favorable to Plaintiff, does not support a finding that Defendant Navarro took Plaintiff to the ground in retaliation for Plaintiff filing his July 27 inmate grievance. Defendant Navarro states that he was unaware on August 2 that Plaintiff had filed a grievance against him based on the July 26 incident. Plaintiff testified in his deposition on August 20, 2018, that he had no personal knowledge that Defendant Navarro knew about his grievance, and merely believed he had based on the statement "start your paperwork now," despite admitting it was a commonly used statement by correctional officers. (ECF No. 111-4 at 64-65.) Although Plaintiff now states in his May 7, 2019, declaration that sergeant Hampton told Defendant Navarro about the grievance (ECF No. 126 at 56), there is no indication how Plaintiff came about that knowledge or that it is within his personal knowledge, and it therefore does not suffice to raise a genuine issue of material fact in opposition to the summary judgment motion. *See Schroeder*, 55 F.3d at 460 & nn. 10-11 (allegations must be shown to be within a declarant's personal knowledge in order to be treated as an affidavit in opposition to the summary judgment motion). Plaintiff has not identified *specific facts* from which a jury could find that Defendant Navarro knew Plaintiff had filed an inmate grievance against him. Rather, Plaintiff has admitted he has no such knowledge, and that he merely so inferred based on an equivocal statement allegedly made by Defendant Navarro. *Anderson*, 477 U.S. at 255; *Nelson v. Pima Community College*, 83 F.3d 1075, 1081-82 (9th Cir. 1996) ("mere allegation and speculation do not create a factual dispute for purposes of summary judgment.")

Furthermore, even if a jury could draw a reasonable inference that the statements Defendant Navarro allegedly made on July 26 and August 2 showed he was aware Plaintiff is the type of inmate who file inmate grievances, Plaintiff must still show there is no genuine issue of material fact in dispute that it was Plaintiff's utilization of the inmate grievance system which motivated Defendant Navarro's actions. *See Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1314 (9th Cir. 1989) (plaintiff must show that the protected

conduct was a "substantial" or "motivating" factor in the defendant's decision to act). Plaintiff admits he covered his cell window in order to cause a disturbance in the prison, admits he threw a trash can over the tier precipitating the August 2 incident, and admits it was only after he twice refused Defendant Navarro's order to pick up the trash that Defendant Navarro activated his alarm, handcuffed him and escorted him off the cell block. Although Defendant Navarro states he took Plaintiff to the ground after Plaintiff attempted to head-butt him, the Court will not make a credibility determination in that regard. Viewing the facts in the light most favorable to Plaintiff, he states that Defendant Navarro took him to the ground, not in retaliation for filing grievances, but because Defendant Navarro "became infuriated" in response to Plaintiff "saying something Navarro did not like." (ECF No. 126 at 58.) Plaintiff identified what he said to Defendant Navarro in his deposition as: "Man, you ain't got shit on me, man. I didn't do nothing." (ECF No. 111-4 at 42.) Viewing that evidence in the light most favorable to Plaintiff as permitting a finding that Defendant Navarro did not have a legitimate penological justification for attempting to trip Plaintiff and take him to the ground, which is discussed below in connection to the excessive force claim, there is no evidence Defendant Navarro was aware of Plaintiff's inmate grievance and took adverse actions against Plaintiff because he had filed an inmate grievance. Thus, with respect to the element of a retaliation claim requiring proof that Plaintiff's utilization of the inmate grievance system was a substantial or motivating factor in those actions, Plaintiff has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322; *Anderson*, 477 U.S. at 255.

The Court **GRANTS** Defendant Navarro's motion for summary judgment with respect to Plaintiff's First Amendment retaliation claim.

### 3. Eighth Amendment excessive force claims

Prison officials violate the Eighth Amendment prohibition against cruel and unusual punishment when they use force against an inmate, not "in a good faith effort to maintain

or restore discipline," but "maliciously and sadistically for the very purpose of causing" the unnecessary and wanton infliction of pain. *Whitley v. Albers*, 475 U.S. 312, 320-21 (1986). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscious of mankind.'" *Hudson v. McMillian*, 503 U.S. 1, 9-10 (1992), quoting *Whitley*, 475 U.S. at 327; *see also Wilkins*, 559 U.S. at 38 ("An inmate who complains of a 'push or shove' that causes no discernible injury almost certainly fails to state a valid excessive force claim.")

In the context of quelling a prison disturbance, "the question of whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on 'whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'" *Hudson*, 503 U.S. at 6, quoting *Whitley*, 475 U.S. at 320-21. "The *Hudson* Court laid out five factors in to be considered in making this determination: (1) the extent of injury suffered by an inmate; (2) the need for application of force; (3) the relationship between that need and the amount of force used; (4) the threat reasonably perceived by the responsible officials; and (5) any efforts made to temper the severity of a forceful response." *Martinez v. Stanford*, 323 F.3d 1178, 1184 (9th Cir. 2003), citing *Hudson*, 503 U.S. at 7.

"From such considerations inferences may be drawn as to whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Whitley*, 475 U.S. at 321. "But equally relevant are such factors as the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of facts known to them, and any efforts made to temper the severity of a forceful response." *Id*.

In weighing the *Hudson* factors, "[u]nless it appears that the evidence, viewed in the light most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain under the standard ... the case should not go to the jury." *See Whitley*, 475

U.S. at 322.

Plaintiff and Defendant Navarro present conflicting affidavits regarding whether Plaintiff told Defendant Navarro he had a medical order to be restrained with waist restraints rather than handcuffs on July 26 and August 2. They also present conflicting affidavits regarding the extent of, and need for, the use of force by Defendant Navarro on August 2, and whether it was precipitated by Plaintiff attempting to head-butt Defendant Navarro as he states, or by Plaintiff saying something Defendant Navarro "did not like" as Plaintiff alleges. The Court will not weigh evidence or make credibility determinations, will presume a finder of fact could credit Plaintiff's account, and will view the evidence in the light most favorable to Plaintiff. *Anderson*, 477 U.S. at 255.

With respect to handcuffing, Plaintiff has submitted a copy of his medical chrono showing that special cuffing is required only for non-emergency escort or transportation. (ECF No. 37 at 139.) Plaintiff admits he created emergencies by covering his cell window on July 26, and by refusing two orders to pick up trash after throwing a trash can over the tier on August 2. In any case, Defendant Navarro correctly observes that *de minimis* use of force does not support an Eighth Amendment excessive force claim where it was "applied in a good faith effort to maintain or restore discipline," and not "maliciously and sadistically for the very purpose of causing harm." *Whitley*, 475 U.S. at 320-21. Plaintiff has not shown Defendant Navarro's decision to handcuff him violated a medical order for waist chains in non-emergency escorting and transporting, and even if he could, he has not identified specific facts showing it was done in bad faith, or maliciously and sadistically for the purpose of causing him harm, or that it resulted in any injury whatsoever. Defendant Navarro is entitled to summary judgment with respect to Plaintiff's claim that his Eighth Amendment right to be free from cruel and unusual punishment was violated by being handcuffed, because Plaintiff has failed identify "specific facts showing there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

Plaintiff alleges Defendant Navarro took him to the ground while escorting him on August 2. Plaintiff states that after handcuffing him, as he was being escorted down the

stairs, Defendant Navarro said: "Yea, I got you now, you threw the trash can at me." (ECF No. 126 at 58.) Plaintiff states that: "In response to what Navarro said I replied and said something Navarro did not like." (*Id*.) Plaintiff identified what he said to Defendant Navarro in his deposition as: "Man, you ain't got shit on me, man. I didn't do nothing." (ECF No. 111-4 at 42.) Plaintiff states in his declaration that: "Navarro became infuriated and therefore attempted to trip me while I was subdued so that I would fall on my face. However, Navarro was unsuccessful and had fallen on the ground instead of me as inmates watched and laughed at Navarro he spontaneously stood up and placed his arm around my neck choking me to the ground. While lying on the ground Navarro placed his knee into my back kneeling on one knee utilizing all of his body weight further injuring me." (ECF No. 126 at 58.) He states: "I yelled and screamed for Navarro to get off my back while squirming and wiggling I shook Navarro off," and that he was stood up and walked a short distance where correctional officer Delgado asked if he was okay. (*Id*.)

Defendant Navarro states in his declaration that as he was escorting Plaintiff to the lower B shower area, Plaintiff suddenly lunged head first toward his face, almost striking him in the head. (ECF No. 111-5 at 3.) Plaintiff tried to break free by aggressively twisting his upper body from side to side while Defendant Navarro yelled commands for him to stop and get down. (*Id*.) Defendant Navarro grabbed Plaintiff by his shirt near his upper left arm and shoulder and forced him to the ground into a prone position. (*Id*.)

Plaintiff presents a declaration from inmate Derek Harmon who states that: "I seen officer Navarro try and use a slam tactic on [Plaintiff], but he fell down on his right knee to the ground and spontaneously got up and used his right arm to choke [Plaintiff] to the ground while he was handcuffed. At that point officer Navarro began to use all of his weight by using his right knee driving it into [Plaintiff]'s back. I seen [Plaintiff] squirm around on the ground and officer Navarro get up and [Plaintiff] being on the ground with another officer who took control." (ECF No. 126 at 100.)

Although Plaintiff alleges in the SAC that he suffered injuries during the January 16 incident with Defendants Romero and Valdovinos, which included a broken, swollen and

permanently disfigured pinky finger, a broken blood vessel in his eye which was swollen shut impacting his vision, and an injured right ankle (ECF No. 37 at 18-19), he does not identify any injuries resulting from the July 26 and August 2 incidents. He testified at his deposition that he felt pain in his hand for about a day and in his back for two to three weeks after the August 2 incident but suffered "no other injuries." (ECF No. 111-4 at 45, 51.) Thus, the *Hudson* factor regarding an absence of injury supports a finding that Defendant Navarro's use of force was "a good faith effort to maintain or restore discipline, [rather than] maliciously and sadistically for the very purpose of causing harm." *Hudson*, 503 U.S. at 6, citing *Whitley*, 475 U.S. at 320-21. Application of the other *Hudson* factors, if necessary, would require credibility determinations, such as the need for the application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by Defendant Navarro, and "any efforts made to temper the severity of a forceful response." *Id.* at 7. However, the "extent of the threat to the safety of staff and inmates," which Plaintiff admits he created, "as reasonably perceived by the responsible officials on the basis of facts known to them," is an "equally relevant" factor. *Whitley*, 475 U.S. at 321.

Plaintiff admits he violated prison regulations and refused lawful orders. He stated in his deposition that after throwing the trash can he twice refused Defendant Navarro's order to pick it up, telling Defendant Navarro: "I'm not picking shit up." (ECF No. 111-4 at 37.) He claims that after he was handcuffed, while being escorted by Defendant Navarro, Plaintiff "turned only his head toward Defendant Navarro" (ECF No. 37 at 6), and "said something Navarro did not like" (ECF No. 126 at 58), which he identified in his deposition as: "Man, you ain't got shit on me, man. I didn't do nothing." (ECF No. 111-4 at 42.) It was at that point that Defendant Navarro allegedly fell to one knee following an unsuccessful attempt to trip Plaintiff, got up, placed Plaintiff in a choke hold, took him to the ground, and put his knee into Plaintiff's back. (*Id.* at 42-44.) Inmate Harmon's statement that he saw Defendant Navarro place Plaintiff in a choke hold does not speak to whether Defendant Navarro reacted to Plaintiff attempting to head-butt him or to what

Plaintiff said. In any case, the uncontroverted evidence here shows that Plaintiff did not report any injuries at that time when he was examined by medical staff (ECF No. 111-3 at 3), and he does not now identify any injuries from Defendant Navarro's actions, only that he suffered temporary pain in his hands and back. (ECF No. 111-4 at 45.)

The fact that Plaintiff was not injured allows an inference to be drawn that the use of force did not evince wantonness with respect to the unjustified infliction of harm, and was not applied "maliciously and sadistically for the very purpose of causing harm." *Whitley*, 475 U.S. at 321. Plaintiff does not dispute that his behavior posed a threat to the safety of staff and inmates, and does not dispute that the use of force was *de minimis* and did not injure him. *See Hudson*, 503 U.S. at 9-10 ("The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscious of mankind.'"), quoting *Whitley*, 475 U.S. at 327. Plaintiff has failed to demonstrate the existence of a genuine issue of material fact showing Defendant Navarro's actions constitute "the type of intentional, unjustified, unprovoked, and brutal conduct" utilizing more than *de minimis* force necessary to sustain an excessive force claim. *Gaut*, 810 F.2d at 924; *Wilkins*, 559 U.S. at 38 ("An inmate who complains of a 'push or shove' that causes no discernible injury almost certainly fails to state a valid excessive force claim.") Finally, the alleged actions by Defendant Navarro do not violate "contemporary standards of decency," especially when there was an admitted need for force and any harm was *de minimus*. *See Hudson*, 503 U.S. at 9 ([t]he standard for an excessive force constitutional violation depends on contemporary standards of decency). Accordingly, the Court **GRANTS** Defendant Navarro's motion for summary judgment with respect to Plaintiff's Eighth Amendment excessive force claim.

### 4. Plaintiff's property claims against Defendant Navarro

Plaintiff alleges that when he returned to his cell after it was searched by Defendant Navarro his television was damaged and personal items were missing. (ECF No. 37 at 5.) Any claim relating to the deprivation of his property without due process of law in violation

of the Fourteenth Amendment does not state a federal cause of action under 42 U.S.C. § 1983 because Plaintiff has an adequate post-deprivation state remedy. *Hudson v. Palmer*, 468 U.S. 517, 533 (1984); *Barnett v. Centoni*, 31 F.3d 813, 816-17 (9th Cir. 1994) (holding that the California Tort Claims Act provides an adequate post-deprivation state remedy for the unauthorized taking of property). The Court **GRANTS** Defendant Navarro's motion for summary judgment with respect to Plaintiff's deprivation of property claim.

Based on the foregoing, the Court **GRANTS** Defendant Navarro's motion for summary judgment with respect to all Plaintiff's claims.

### D. Defendants Romero and Valdovinos

For the following reasons, the Court finds Defendants Navarro and Valdovinos are entitled to summary judgment with respect to Plaintiff's deliberate indifference to medical care claim, but finds there are genuine issues of material fact in dispute regarding Plaintiff's excessive force and retaliation claims.

### 1. Medical claims against Defendants Romero and Valdovinos

As set forth above, in order to establish deliberate indifference to his serous medical needs in violation of the Eighth Amendment, Plaintiff must point to evidence in the record from which a trier of fact might reasonably conclude the Defendants placed him at risk of "objectively, sufficiently serious" harm, and had a "sufficiently culpable state of mind" when they interfered with or denied him medical care. *Wallis*, 70 F.3d at 1076.

Plaintiff states in his declaration that he was walking away after being refused a kosher meal when Defendant Valdovinos "stated 'yea get the fuck out of here.'" (ECF No. 126 at 60.) Plaintiff states: "I was startled and abruptly turned around surprised at being disrespected blatantly and responded 'what!' Romero instantly whipped out his MK-9 oleoresin spray from about three feet away and began spraying me directly in my face." (*Id.*) Plaintiff states that: "I asked to be decontaminated by Romero and Valdovinos but [they] denied me and placed me into holding module #1 where I was restricted from any form of air flow the handcuffs were left on me and never taken off as I was in pain and burning up I could not breathe and asked LVN Ominigbo to receive my asthma inhaler and

to be decontaminated LVN Ominigbo instructed me to wait and had gone out the gym and looked at me and shrugged his shoulders in despair." (ECF No. 126 at 60-61.) Plaintiff states that he asked correctional officer Barrozo:

> if I could be decontaminated, have a restroom break the handcuffs removed, and a drink of water, as well as my asthma inhaler but was denied officer Barrozo ignored me. [¶] I after sometime of being handcuffed from behind and in pain in light of my physical condition maneuvered the handcuffs from behind me to the front and began to urinate on myself and attempted to use the urine soaked jacket I had hanging over the handcuffs on my face to try and relieve the burning. I then was moved to administrative segregation at about 10:00 a.m. by officer Lopez and Barrozo. [¶] I arrived at B-facility administrative segregation and was allowed to shower.

(*Id*. at 61-62.)

LVN Ominigbo states that he was called about 7:35 a.m. to evaluate Plaintiff, who responded "no comment" when asked why he needed medical attention. (ECF No. 116-6 at 2.) Nurse Ominigbo states it was evident Plaintiff had been exposed to OC spray, "but had no other injuries and did not complain of any other injures, and he needed no further medical treatment." (ECF No. 116-6 at 2.) LVN Ominigbo further states that Plaintiff "had been offered an opportunity to decontaminate, and he was decontaminated by being removed from the area where the OC spray was used, and exposed to fresh air. I also specifically instructed inmate Jackson on self-decontamination techniques." (*Id*.)

Plaintiff does not identify any genuine issue of material fact showing either Defendant Romero or Valdovinos were aware he was in serious medical distress and ignored his need for treatment. Rather, the uncontroverted evidence shows Defendant Romero immediately sought a medical evaluation for himself after the incident while Defendant Valdovinos escorted Plaintiff to a holding cell where he was immediately examined by medical personnel and continuously monitored thereafter by correctional officer Barrozo, not by Defendant Valdovinos. Correctional officer Barrozo attaches a holding cell log to his declaration indicating that Plaintiff was placed in the holding cell at 7:40 a.m., that he refused decontamination, and was monitored in his holding cell every

fifteen minutes from 7:40 a.m. until he was released at 10:10 a.m. (ECF No. 116-5 at 3.) Plaintiff states in his declaration that he asked LVN Ominigbo and officer Barrozo, not the Defendants, to be decontaminated, for a restroom break, for a glass of water and for his asthma inhaler, but his requests were denied. (ECF No. 126 at 61.) There is no genuine issue of material fact in dispute that Defendants Romero and Valdovinos knew of and ignored a serious risk to Plaintiff's health, or that their actions or inactions caused him to be denied or delayed medical treatment. Plaintiff's evidence is not such that a "fairminded jury could return a verdict for him on the evidence presented." *Anderson*, 477 U.S. at 255.

The Court **GRANTS IN PART** the motion for summary judgment by Defendants Romero and Valdovinos as to Plaintiff's deliberate indifference to medical care claim.

### 2. Excessive force claims against Defendants Romero and Valdovinos

Plaintiff alleges Defendants Romero and Valdovinos used excessive force in violation of the Eighth Amendment on January 16, 2017. The statements of the parties regarding the events that morning differ. Plaintiff states that he was walking away after being denied his kosher meal when Defendant Valdovinos said "yea get the fuck out of here." (ECF No. 126 at 60.) Plaintiff states: "I was startled and abruptly turned around surprised at being disrespected blatantly and responded 'what!' Romero instantly whipped out his MK-9 oleoresin spray from about three feet away and began spraying me directly in my face. I did not strike Romero, nor did I resist or disobey him this was an unprovoked attack." (*Id.*) Plaintiff presents the following description of the Defendants' use of force:

> Romero instantly whipped out his MK-9 oleoresin spray from about three feet away and began spraying me directly in my face. I did not strike Romero nor did I resist or disobey him this was an unprovoked attack. [¶] I was blinded from being sprayed in the face with the OC spray and immediately went down to the ground trying to cover up as Romero and Valdovinos began to pounce on me by punching and kicking me. I was then poked in the eye with a madock baton while Romero simultaneously broke my pinky finger and destroyed both left and right wrist braces (medical appliances) I wore. [¶] I was cuffed from behind and forcefully lifted to my feet and placed into a maneuver called the chicken wing and escorted forcefully to the gym and I asked to be decontaminated by Romero and

Valdovinos but [they] denied me.

(ECF No. 126 at 60.)

Defendant Romero, on the other hand, states that Plaintiff "quickly advanced toward me and yelled at me, 'fuck you and fuck your tray nigga!' . . . then swung his left fist at my face, . . . then swung his right fist at me, hitting me in the upper chest," and it was then that he ordered Plaintiff to get down, and only discharged his OC spray after Plaintiff refused that order. (ECF No. 116-8 at 2.) Defendant Valdovinos states that: "I saw inmate Jackson aggressively move toward Correctional Officer Romero and punch Correctional Officer Romero in the chest with his right fist," and that it was only after Plaintiff had ignored orders from both officers that Defendant Romero unholstered his OC spray device and sprayed Plaintiff. (ECF No. 116-10 at 2.) Plaintiff replies that "contrary to the defendants' declarations, during these events I did not assault nor commit battery, resist, threaten or delay the officers in their duties in any form or fashion." (ECF No. 126 at 62.) He lists as injuries a broken, swollen and permanently disfigured pinky finger, an eye which was swollen shut impacting his vision, and an injured right ankle. (ECF No. 37 at 18-19.)

Plaintiff's verified declaration is sufficient to avoid summary judgment regarding his excessive force claims against Defendants Romero and Valdovinos because he has presented "specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. Although his affidavit contrasts starkly with the Defendants' affidavits, in particular whether Plaintiff punched Defendant Romero in the chest or was entirely passive throughout the encounter, the Court may not weigh evidence or make credibility determinations on a motion for summary judgment, and any inferences drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *Id*. at 255. Plaintiff's evidence need only be such that a "jury might return a verdict in his favor." *Id*. at 257. If a finder of fact believes Defendant Romero sprayed Plaintiff with OC spray merely for saying "what!," and Defendants Romero and Valdovinos then kicked and beat him without provocation or resistance while he was on the ground as stated by Plaintiff in

his verified declaration, a finder of fact could find the Defendants did not apply force "in a good faith effort to maintain or restore discipline" as they contend, but did so "maliciously and sadistically for the very purpose of causing harm" as Plaintiff claims. *Hudson*, 503 U.S. at 6. For those reasons, and in light of the injuries Plaintiff allegedly suffered, if a finder of fact credits Plaintiff's version over the Defendants' version, a finder of fact could draw an inference that "the use of force could [not] plausibly have been thought necessary," but "instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Whitley*, 475 U.S. at 321.

Accordingly, the Court **DENIES IN PART** the motion for summary judgment with respect to Plaintiff's excessive force claim against Defendants Romero and Valdovinos.

### 3. Retaliation claims against Defendants Romero and Valdovinos

Plaintiff alleges in the SAC that he was temporarily transferred to another facility after the August 2, 2016, incident with Defendant Navarro, and when he was returned to RJDCF on January 13, 2017, he was once again housed on Facility C where the incidents with Defendant Navarro occurred, despite informing prison officials he did not feel safe returning to Facility C. (ECF No. 37 at 13, 15.) He states in his declaration that after he was kicked and punched by Defendants Romero and Valdovinos without provocation or resistance he heard both Defendants "boasting about beating me to the surrounding correctional officers, they stated the beating was in retaliation for filing paper work for Navarro's injustices." (ECF No. 126 at 61.) He heard Defendant Valdovinos say: "you should not have come back," and "you should have never been placed on Facility C after what happened with Navarro," to which Defendant Romero replied "it's ok because this time he would make sure that I did not come back." (*Id*.)

"Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes*, 408 F.3d at 567-68. "Prisoners have a

First Amendment right to file grievances against prison officials and to be free from retaliation for doing so." *Watison*, 668 F.3d at 1114.

Defendants argue that Plaintiff's retaliation claim fails because they were unaware he had filed an inmate grievance against Defendant Navarro, and because their use of force was justified in light of Plaintiff's aggressive, violent assault on Defendant Romero, and reasonable in light of the legitimate penological interest in restoring safety and security in the prison after Plaintiff attacked Romero. (ECF No. 116-1 at 20.) However, as set forth above, there exists genuine issues of material fact whether their use of force was applied in such a manner. That disputed issue, along with the statements in Plaintiff's declaration that they told him they were retaliating against him for filing grievances against Defendant Navarro, if credited by a finder of fact, raises genuine issues of material fact as to whether Defendants Romero and Valdovinos took adverse action against Plaintiff because of his protected activity, and whether those actions did or did not reasonably advance a legitimate correctional goal.

Accordingly, the Court **DENIES IN PART** the motion for summary judgment on Plaintiff's claim that the actions taken by Defendants Romero and Valdovinos were in retaliation for Plaintiff's utilization of the inmate grievance procedures.

### 4. Plaintiff's claims are not barred by *Heck* and *Balisok*

Defendants Romero and Valdovinos argue that a judgment in favor of Plaintiff on his excessive force claim would necessarily imply the invalidity of the prison disciplinary finding that Plaintiff battered Defendant Romero, and unless and until Plaintiff can overturn that finding and the resultant assessment of 150 days loss of good time credits, his claim is barred by *Heck v. Humphrey*, 512 U.S. 477 (1994) and *Edwards v. Balisok*, 520 U.S. 641 (1997). (ECF No. 116-1 at 20-25.)

"[I]n order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a

state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." *Heck*, 512 U.S. at 486-87. A civil rights claim challenging the legality of a conviction or the length of confinement that has not been so invalidated is not cognizable under 42 U.S.C. § 1983. *Id*. at 487; *Balisok*, 520 U.S. at 643. "[T]he applicability of the favorable termination rule turns solely on whether a successful § 1983 action would necessarily render invalid a conviction, sentence, or administrative sanction that affected the length of the prisoner's confinement." *Ramirez v. Galaza*, 334 F.3d 850, 856 (9th Cir. 2003).

Plaintiff was issued an RVR charging him with battery on a peace officer after the incident involving Defendants Romero and Valdovinos. (ECF No. 116-9 at 6-8.) That RVR contains Defendant Romero's statement that:

> On Monday, January 16, 2017, at approximately 0730 hours, while performing my duties as the Facility C Security Patrol 4, while processing inmates in to the Facility C Dining Hall #2. I was approached by Inmate Jackson, D (J41016, FC-13-131L) and stated: Give me my mothafuckin food nigga!" I advised Inmate Jackson he was not on the kosher list and to enter Dining Hall #2 and retrieve a breakfast tray. Inmate Jackson advanced towards me and stated, "Fuck you and fuck you tray nigga!" Inmate Jackson swung his left fist towards my facial direction with negative contact. Inmate Jackson then swung his right fist making contact, striking my upper chest area. I gave Inmate Jackson clear verbal orders to get down with negative results. Fearing for my safety and to prevent further attack from Inmate Jackson's swinging his fist, I instinctively stepped back unholstered my state issue MK-9 Oleoresin Capsicum Spray, standing from approximately three (3) feet away, I disbursed one three (3) second burst, aiming and striking Inmate Jackson's facial area. Inmate Jackson complied and assumed a prone position. Officer G. Valdovinos placed Inmate Jackson in handcuffs and removed him from the affected area. I proceeded to the Triage Treatment Area (TTA), where I received a Medical Evaluation (CDCR 7219), noting pain and redness on my chest.

(*Id*. at 6.)

A hearing was held on February 26, 2017, the report of which states Plaintiff refused to attend and that a not guilty plea was entered on his behalf. (*Id*. at 9, 13, 14.) He was found guilty of battery on a peace officer based on a preponderance of evidence and

assessed a loss of 150 days custody credits.  (*Id*. at 14.)  Plaintiff states that: "I was denied an opportunity to appear at the RVR hearing on February 26, 2017 as officer Palacios appeared at the cell door as I used the restroom.  I asked her to give me one moment and she never returned.  I notified the sergeant but was informed it was too late."  (ECF No. 126 at 62.)

Success on Plaintiff's excessive force and retaliation claims in this action would not *necessarily* invalidate his prison disciplinary finding that he punched Defendant Romero in the chest and the resultant loss of custody credits.  Defendant Romero states that he did not use force against Plaintiff with a sadistic or malicious intent to cause him harm, pain or injury, that he acted at all times in furtherance of a legitimate penological purpose to maintain safety and security and to protect himself and others, and that he has no personal animosity toward Plaintiff.  (ECF No. 116-8 at 2-3.)  Defendant Valdovinos states that he did not use force on Plaintiff with a malicious or sadistic intent, that he acted with the legitimate penological purpose to maintain safety and securing of the institution and protect himself, has never had any personal animosity toward Plaintiff, and did not retaliate against him for filing inmate grievances against Defendant Navarro as he was unaware of any such filings.  (ECF No. 116-10 at 3-4.)

Irrespective of whether a trier of fact in this matter finds Plaintiff punched Defendant Romero, and that Defendants Romero and Valdovinos were therefore permitted or even obligated to respond with force for the reasons they give for responding, as set forth above there remains genuine issues of material fact regarding whether their use of force "inflicted unnecessary and wanton pain and suffering," which "ultimately turns on 'whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'"  *Hudson*, 503 U.S. at 6, quoting *Whitley*, 475 U.S. at 320-21.  Even if Plaintiff punched Defendant Romero and it gave rise to a need to respond with force to quell a threat to institutional security, of the five *Hudson* factors, genuine issues of material fact would remain as to 1, 3 and 5.  *See Hudson*, 503 U.S. at 7 (listing factors as: (1) the extent of the injury suffered by an inmate; (2) the need

for application of force; (3) the relationship between that need and the amount of force used; (4) the threat reasonably perceived by the responsible officials; and (5) any efforts made to temper the severity of a forceful response).

Irrespective of whether Plaintiff precipitated the encounter by punching Defendant Romero, the description given by Plaintiff in his verified declaration that he was beaten and kicked by the Defendants after he assumed the prone position on the ground and offered no resistance and no longer posed a threat, and that the beating was in retaliation for having pursued inmate grievances, raises a genuine issue of material fact "as to whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Whitley*, 475 U.S. at 321. Success on his claim that Defendants Romero and Valdovinos used such force against him in retaliation for filing grievances would not necessarily invalidate his prison disciplinary finding that he battered Defendant Romero or the loss of custody credits. Accordingly, Plaintiff's claims not barred by *Heck* and *Edwards*.

### 5. Qualified Immunity

Finally, Defendants Romero and Valdovinos claim an entitlement to qualified immunity on the basis that they did not violate Plaintiff's Eighth Amendment right to be free from cruel and unusual punishment. (ECF No. 116-1 at 25-27.) Their argument is based on their contention that their use of force was necessary and reasonable under the circumstances in light of Plaintiff's aggressive assault on Defendant Romero. (*Id.*)

"Government officials enjoy qualified immunity from civil damages unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Jeffers v. Gomez*, 267 F.3d 895, 910 (9th Cir. 2001), quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The Court must determine: (1) whether the facts alleged, taken in the light most favorable to Plaintiff, demonstrate that the Defendant's conduct violated a statutory or constitutional right; and (2) whether the right at issue was "clearly established" at the time it is alleged to have been violated. *Saucier v.*

17cv0882-CAB (BLM)

*Katz*, 533 U.S. 194, 201 (2001), receded from by *Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (holding that the *Saucier* sequence "is often appropriate" but not "mandatory.")

As set forth above, there is a genuine issue of material fact in dispute regarding whether Plaintiff was beaten by Defendants Romero and Valdovinos without provocation or justification in retaliation for filing an inmate grievance against Defendant Navarro. Plaintiff has a clearly established right to be free from such alleged retaliatory beatings. The Ninth Circuit has held that "a prison guard's use of excessive force was clearly established" since 1992 when the Supreme Court held that the "settled rule [is] that 'the unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment.'" *Martinez*, 323 F.3d at 1184 (finding qualified immunity improperly granted to officers who allegedly beat an inmate during a cell extraction, despite his lack of resistance), quoting *Hudson*, 503 U.S. at 5; *see also Hudson*, 503 U.S. at 7-10 (holding that guards violated Hudson's Eighth Amendment rights when they gratuitously punched and hit him while escorting him between prison facilities).

Accordingly, the Court denies without prejudice Defendant's request for qualified immunity. Defendants may reassert their claim for qualified immunity at a later stage of these proceedings after any necessary factual disputes have been resolved.

## IV. Conclusion and Order

Based on the foregoing, **IT IS ORDERED THAT**:

Defendant Navarro's Motion for summary judgment (ECF No. 111) is **GRANTED**.

Defendants Romero's and Valdovino's Motion for summary judgment (ECF No. 116) is **GRANTED IN PART** with respect to Plaintiff's medical care claims and **DENIED IN PART** with respect to Plaintiff's retaliation and excessive force claims.

**IT IS SO ORDERED.**

Dated: July 17, 2019

_____
Hon. Cathy Ann Bencivengo
United States District Judge